CREMEAN, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

(No. 76-91—Decided December 8, 1976.)

164

*Messrs. Smith, Clark & Holzapfel* and *Mr. John E. Holzapfel,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Charles S. Rawlings* and *Mr. Kevin F. Duffy,* for appellee.

CORRIGAN, J. This court's review on appeal of orders of the Public Utilities Commission is limited to a consideration of whether those orders are unreasonable and unlawful, and, on questions of fact, this court will not substitute its judgment for that of the commission unless it appears from the record that the finding and order were manifestly against the weight of the evidence.

In the present cause, appellant maintains that the record establishes that he had a prior written commitment for residential gas service, and that the commission's finding was unreasonable and unlawful. We disagree.

The commission's interim supplemental emergency order, dated June 23, 1972, defines "commitment" to include not only written commitments by gas companies, but also written applications for gas service submitted by customers within 15 days of the commission's order, provided that satisfactory evidence is submitted that construction of units for residential purposes in accordance with plans which were based on the use of gas-utilization equipment began prior to October 1, 1972. The order states further that gas service will be rendered only to those units which were under construction prior to October 1, 1972.

It was pursuant to the latter part of this definition that appellant was furnished gas service for the 48 units of the Parkwick complex which were under construction prior to October 1, 1972.

Appellant's contention that a written commitment for gas service to the entire complex existed prior to the date of the order is based on correspondence between the appellant and Columbia.

The record reveals that, in November of 1971, while Parkwick was still in the planning stage, the appellant contacted Mr. Jack Good, an employee of Columbia, and discussed the feasibility of using natural gas in appellant's project. As a result of the conversation, Good supplied appellant with a printed guide explaining the benefit of using natural gas.

Subsequently, in December of 1971, appellant again met with Good and provided him with a set of plans for the Parkwick Apartments project. Appellant stated that Good submitted these plans to Columbia's engineering department to determine the feasibility of extending gas mains into the project.

The appellant testified that, in February of 1972, Good gave him a confirmation form and requested that he submit a letter agreeing to use natural gas in the Parkwick Apartments. As a result of this request, appellant submitted a letter, dated March 7, 1972, indicating his intention to use natural gas for the entire project. This letter and another, dated February 18, 1972, from D. K. Seizert, Marketing Manager of Columbia, to R. L. Lang, District Marketing Manager of Columbia, calling for a written confirmation of the intention of appellant to use natural gas in the project, were offered in evidence by appellant to show the existence of a written commitment by Columbia to furnish residential gas service to appellant's project.

On August 14, 1972, Columbia sent a written commitment to appellant, confirming Columbia's agreement to supply natural gas to all 160 units of appellant's project. This letter was also offered in evidence by the appellant.

The commission determined that this August 14, 1972, letter was ineffective to establish a prior written commitment to supply natural gas service to appellant, since it was submitted after the June 23, 1972, interim supplemental emergency order. It is clear that this letter does not establish a commitment under the provisions of that order.

Appellant maintains, however, that the confirmation form sent by Columbia and the March 7th letter of com-

mitment or acceptance furnished by appellant, together with the February 18th letter from Columbia's marketing manager to Lang, constitute a written commitment to supply natural gas.

The commission, on the basis of Lang's testimony, determined that the February 18, 1972, and March 7, 1972, letters merely constituted a line extension agreement, in lieu of a line extension deposit.

Lang testified that the reason for submitting plans of a development to Columbia is to ascertain the feasibility of a proposed project. If the plans are favorably received, Columbia, pursuant to Section 3, Paragraph 34 of its own Rules and Regulations, entitled Physical Property, does not require a line extension deposit. If, however, the plans are not sufficient to insure a reasonable return on capital, Columbia requires a line extension deposit from the developer. Columbia maintained before the commission that the plans of appellant were favorably accepted, and that the March 7, 1972, letter was merely an agreement to extend lines into appellant's project without the necessity of a line extension deposit.

We are in agreement with the commission's determination. The June 23, 1972, interim supplemental emergency order specifically defines a "commitment" as "* * * a company letter addressed to a customer assuring him of a particular residential gas supply * * *."

The contents of both the February 18, 1972, and March 7, 1972, letters relate primarily to the need for line extension deposits and the amount of such deposits should the appellant fail to install 160 meters within 12 months. Neither letter contained an express assurance from Columbia that the company would supply a particular quantity of residential gas service. We believe that the interim supplemental emergency order's definition of "commitment" requires an express commitment to provide a particular residential gas supply. The fact that line extension agreements were not intended to be included in this definition, although they imply that the companies will supply gas

service, is evidenced by the following excerpt from the "discussion" portion of the commission's June 23, 1972, order:

"Another matter which disturbed this commission was the fact that many developers and builders had remitted to the companies deposits to cover part of the cost of the installation of mains which were laid to serve a particular development. Although admitting that all or portions of these lines would be rendered useless for gas which would not [be] forthcoming if the requested restrictions were granted, the companies' solution was to renegotiate the deposit contracts for a period not to exceed five (5) years. The commission finds this proprosal unacceptable. Currently the movants hold nearly two million dollars in a deposit fund. Inherent in the deposit contracts is the condition that said companies will provide gas. Yet this basic unspoken term is precisely the one which the companies are presently unable to fulfill. To allow the movants the option to retain the deposit fund for a period of five (5) years on the hope (the company witnesses could not state even a 'ball park' projection date for return to full gas service) that gas would become available in that period seems unreasonable. In short, a renegotiated period of more than twelve (12) months is excessive in our opinion."

It is the opinion of this court that the opinion and order of the Public Utilities Commission is supported by the record in this case and, therefore, the order is not unreasonable or unlawful. The opinion and order of the commission is, therefore, affirmed.

*Order affirmed.*

O'NEILL, C. J., HERBERT, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.